IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                                        Criminal No.:  ELH-18-431

SHAWN MOORE,
    Defendant.

**MEMORANDUM OPINION**

Shawn Moore was sentenced in May 2019 to 84 months' imprisonment, with credit from
August 2018, for a drug conspiracy offense.  ECF 95.  This Memorandum Opinion resolves
Moore's pro se motion for compassionate release, filed pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).[1]
ECF 156.  It is supported by several exhibits.  ECF 156-1.  Moore has also submitted a supplement
to the Motion, containing additional exhibits.  ECF 162.  I shall refer to ECF 156 and ECF 162
collectively as the "Motion."  The government opposes the Motion (ECF 180, the "Opposition"),
supported by several exhibits.  ECF 180-2; ECF 180-3; ECF 182 (sealed exhibits).  Moore has
replied.  ECF 186 (the "Reply").

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall grant
the Motion in part, and reduce Moore's total sentence to 71 months of imprisonment.

**I. Background**

On August 15, 2018, the grand jury issued an Indictment charging Moore and two others
with various offenses.  ECF 35.  Of relevance here, Moore was charged with one count of
conspiracy to distribute and possess with the intent to distribute 28 grams or more of a mixture or

---

[1] The Office of the Federal Public Defender ("OFPD") informed the Court that it would
not supplement the Motion or ask for appointment of counsel.  ECF 158.  But, the OFPD provided
the Court with documentation from Moore regarding exhaustion of administrative remedies.  *Id.*

substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. § 846 (Count One).  The offense carries a mandatory minimum term of imprisonment of 60 months.  *See* ECF 69 at 2; 21 U.S.C. § 841(b)(1)(B).

On March 5, 2019, Moore entered a plea of guilty to Count One.  ECF 68.  The plea was tendered pursuant to a Plea Agreement reached under Fed. R. Crim. P. 11(c)(1)(C).  ECF 69 (the "Plea Agreement").

The Plea Agreement contemplated a base offense level of 24 under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."), before any reduction for acceptance of responsibility.  *Id.* ¶ 6.  But, it noted that if the defendant were found to be a career offender, then his base offense level would be 34.  *Id.*  There was no agreement as to defendant's criminal history.  *Id*. ¶ 7.  Pursuant to Fed. R. Crim. P. Rule 11(c)(1)(C) (the "C Plea"), the parties agreed to a sentence of imprisonment ranging from 60 months to 96 months.  *Id*. ¶ 9.

The Plea Agreement included a stipulation of facts.  *Id*. at 9-10.  According to the stipulation, from at least April 2018 through August 2018, Moore conspired with "Co-Defendant 1" and "Co-Defendant 2," and others, to distribute, and possess with intent to distribute, cocaine base in Baltimore.  *Id*. at 9.  Moore agreed that it was reasonably foreseeable to him that more than 28 grams of cocaine base would be distributed by members of the conspiracy.  *Id*. at 10.

Specifically, in April 2018 the DEA began investigating a drug shop operating on Sergeant Street in Baltimore.  *Id*. at 9.  "This led to a court-authorized wiretap of a phone" belonging to Co-Defendant 1, and ultimately of two phones belonging to Moore.  *Id*.  "Moore was intercepted in numerous calls with Co-Defendant 1, Co-Defendant 2, and others discussing drug transactions."  *Id*.

On June 26, 2018, investigators observed Moore at the residence of Co-Defendant 1, supplying Co-Defendant 1 with narcotics. *Id*. Law enforcement officers followed Moore from that location and observed Moore talking to an individual selling soda on the corner. *Id*. The individual then "ran back to the area where he kept his cooler filled with soda and placed an unknown object inside." *Id*. Shortly afterwards, law enforcement intercepted a call from Moore to Co-Defendant 1. *Id*. In the call, Moore informed Co-Defendant 1 that he believed law enforcement officers were following him, that he had just discarded narcotics, and that he needed Co-Defendant 1 to retrieve them. *Id*.

On the same day, Moore communicated with Co-Defendant 2 to obtain a resupply of narcotics. *Id*. Moore texted Co-Defendant 2 and said "so far pool ball . . . Ima wait bout an hour to see anything else got to go up Erdman at 2 anyway." *Id*. "Pool ball" referred to one-eighth of an ounce of cocaine. *Id*. Moore then "communicated with a buyer and decided on a meet location." *Id*. Later in the day, Moore and Co-Defendant 2 met in a parking lot near Erdman Shopping Center in Baltimore, where Co-Defendant 2 supplied Moore with cocaine. *Id*. Moore then met the buyer at the same location. *Id*.

A search warrant was executed at Moore's residence and his vehicle on August 3, 2018. *Id*. "When Moore saw the agents executing the search warrant, he rammed his car in a police car in an attempt to escape." *Id*. Law enforcement agents recovered a "large amount of cash" from Moore's vehicle, as well as "drug packaging materials including cut, gelcaps, and a digital scale." *Id*.

Sentencing was held on May 6, 2019. ECF 94. At that time, Moore was 33 years old. *See* ECF 73 (Presentence Report or "PSR") at 2.

The PSR determined that Moore qualified as a career offender under § 4B1.1 of the Guidelines on the basis of the underlying drug conspiracy offense, as well as defendant's prior convictions for armed robbery, conspiracy to distribute heroin, and possession with intent to distribute. *Id*. ¶¶ 23, 35. As a career offender, and after three deductions for acceptance of responsibility, Moore's final offense level was 31. *Id*. ¶ 26. Had Moore not been a career offender, however, his final offense level would have been 21. *Id*. ¶ 22.

Moore had a total of seven criminal history points. *Id*. ¶ 34. This would yield a criminal history category of IV. *Id.* ¶ 34. But, based on defendant's career offender status, his criminal history category increased to VI, under U.S.S.G. § 4B1.1(b). *Id*. ¶ 35.

As to defendant's prior record, the PSR reflects that in 2004, in the Circuit Court for Baltimore County, Moore was convicted of armed robbery of a Royal Farms convenience store and use of a handgun during a felony crime. *Id*. ¶ 30. The offense was committed in December 2003, when Moore was 17 years old. *Id*. But, he was prosecuted as an adult, and he was sentenced to eight years' incarceration for the armed robbery offense, and to a concurrent term of five years' incarceration for the handgun offense. *Id*.

Then, in 2009, Moore was convicted in federal court of conspiracy to distribute heroin. *Id*. ¶ 31; *see United States v. Moore*, ELH-08-381 (D. Md. Aug. 12, 2008).[2] The conviction related to Moore's involvement in a conspiracy to distribute heroin while he was incarcerated in the Jessup Pre-Release Unit in Jessup, Maryland. ECF 73, ¶ 31. Moore pleaded guilty and was sentenced to 24 months' incarceration, as well as 36 months of supervised release. *Id*.; *see* ELH-08-381, ECF 164; *id*., ECF 231.

---

[2] Moore's prior federal case was originally assigned to Judge Andre Davis. It was reassigned to Judge Benson Everett Legg after Judge Davis was elevated to the Fourth Circuit. And, it was reassigned to me due to the retirement of Judge Legg.

In 2013, in the Circuit Court for Baltimore City, Moore was convicted of possession with intent to distribute narcotics. ECF 73, ¶ 32. He was sentenced to one year of supervised probation before judgment. *Id.*[3]

As noted, based on defendant's classification as a career offender under U.S.S.G. § 4B1.1, he had a final offense level of 31 and a criminal history category of VI. The Guidelines called for a period of incarceration ranging from 188 to 235 months. *Id.* ¶ 79. Without the career offender enhancement, however, defendant would have had a final offense level of 21 and a criminal history category of IV, and the Guidelines would have called for a sentence of incarceration ranging from 60 to 71 months. *Id.* ¶ 80. As noted, under the C Plea the parties agreed to a sentence ranging between 60 and 96 months' imprisonment. ECF 69, ¶ 9; ECF 73, ¶ 81. And, as mentioned, the offense carried a mandatory minimum term of imprisonment of 60 months. *See* ECF 69 at 2; 21 U.S.C. § 841(b)(1)(B).

Defendant is 5'9" tall and, at sentencing, he weighed 190 pounds. *Id.* ¶ 55. He reported that he was in "excellent physical health," but that he had "seasonal allergies and asthma, which he was diagnosed with during infancy." *Id.* ¶ 56. He used albuterol as needed to assist with this condition. *Id.* Moore's mother reported that defendant was diagnosed with asthma as an infant and used a nebulizer as needed for the condition. *Id.* ¶ 59. The PSR also noted: "Medical records provided by Jai Medical Center confirmed the following medical history for the defendant: asthma, allergic rhinitis, and hypertension." *Id.* ¶ 58. Moore also stated that he was diagnosed with bipolar disorder at age 14. *Id.* ¶ 60.

---

[3] In addition, in 2004 Moore was convicted in the District Court for Baltimore County of driving a motor vehicle on a highway on a suspended license and sentenced to one day of probation before judgment. And, in 2014, he was convicted in the Circuit Court for Baltimore City of negligent driving and fined $140. *Id.* ¶¶ 29, 33. However, neither of these offenses scored any criminal history points.

Moore reported good relationships with his family and said that he had an "excellent" childhood, despite the absence of his father. *Id*. ¶¶ 47, 48. The PSR reflects that he began consuming alcohol at age 14, and continued until he was incarcerated. *Id*. ¶ 62. Moore has two children (*id*. ¶ 51) and he earned his GED while incarcerated. *Id.* ¶ 65.

The government requested a sentence of 96 months' imprisonment. ECF 83. Moore requested a sentence of 60 months' imprisonment. ECF 85. I accepted the C Plea and imposed a sentence of 84 months' imprisonment, with credit for time served since August 3, 2018. ECF 95 at 2. In the Statement of Reasons (ECF 96), I observed, *id.* at 3: "In the context of this case, the Career Offender Guidelines were draconian." In addition, I recommended Moore's participation in a substance abuse program, including the Residential Drug Abuse Program at the Bureau of Prisons ("BOP"), and recommended that he be designated to FCI Petersburg. ECF 95 at 2.

Moore is currently incarcerated at FCI Petersburg Medium. ECF 156; ECF 180 at 2. He has a projected release date of July 20, 2024. ECF 182 at 3; *see also Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Jan. 10, 2022). Including his credit for time served since August 3, 2018, Moore has served about 41 months of his 84-month sentence, or approximately 49%.

The briefing and the exhibits do not suggest any disciplinary infractions while defendant has been in custody. Notably, Moore's medical records reflect that he received both doses of the Moderna COVID-19 vaccine, one in May and the other in June 2021. ECF 182-1 at 9, 11.

Defendant filed an administrative request for compassionate release on April 23, 2020, which was denied by the Warden on April 29, 2020. ECF 156-1 at 3; ECF 180-2.[4] He noted an appeal on May 6, 2020, which was denied on May 18, 2020. ECF 156-1 at 4-5. He submitted a

---

[4] This administrative request was submitted through counsel. *See* ECF 180-2.

regional administrative remedy appeal on May 22, 2020; the record does indicate a disposition. *Id*. at 6. In any event, the government does not contest that Moore has exhausted his administrative remedies. *See* 180 at 7.

In his administrative request for compassionate release, Moore represented that, if he is released, he will reside with his wife in Baltimore; that he will seek employment; and that his mother will provide him with assistance and financial support. ECF 180-2 at 1. In his Reply, Moore states that he has a "job arranged for [him]," although he does not elaborate. ECF 186 at 6.

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495. And, § 3582(c)(i) is one of the exceptions. *United States v. Jenkins*, ___ F.4th ___, 2021 WL 6130105, at *4 (4th Cir. Dec. 29, 2021).

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. Section 3582 was enacted as part of the Sentencing Reform Act of 1984. Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 Fed. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v.*

*Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).  In other words, the BOP "had the exclusive authority to petition the court for sentence modifications on compassionate release grounds." *Jenkins*, 2021 WL 6130105, at *5.

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, he or she may petition a court directly for compassionate release.  *Jenkins*, 2021 WL 6130105, at *5;  *McCoy*, 981 F.3d at 276.  That option constitutes a sea change in the law.

Under  § 3582(c)(1)(A),  the  court  may  modify  the  defendant's  sentence  if,  "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

(i) extraordinary and compelling reasons warrant such a reduction;

8

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission. And, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 2021 WL 6130105, at *5.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. But, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 Fed. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

In U.S.S.G. § 1B1.13, the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release. It is titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement." *See McCoy,* 981 F.3d at 276-77. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C).

*See McCoy,* 981 F.3d at 276.

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act.  *McCoy*, 981 F.3d at 276.  Of significance here, it is only "directed at BOP requests for sentence reductions."  *Id.* (citing U.S.S.G. § 1B1.13).  "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *Id.* at 282; *see also Jenkins*, 2021 WL 6130105, at *5; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Therefore, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Consequently, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id*. at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 2021 WL 6130105, at *5. But, "rehabilitation alone cannot serve as a basis for compassionate release," although it may be considered. *United States v. Davis*, ___ F. App'x ___, 2022 WL 127900, at * 1 (4th Cir. Jan. 13 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; 28 U.S.C. § 994(t).

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). And, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *see also United States v. Butts*, ___ Fed. App'x ___, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed.

App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 2021 WL 6130105, at *5.  However, of relevance here, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction."  *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187. Therefore, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant.  *McCoy*, 981 F.3d at 284 (citation omitted); *see Jenkins*, 2021 WL 6130105, at *5.

Nevertheless, compassionate release is a "rare" remedy.  *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).  And, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release."  *Jenkins*, 2021 WL 6130105, at *6.  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *High*, 997 F.3d at 187 (internal quotation marks omitted).

### III.  COVID-19[5]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[6]  Defendant filed his motion for compassionate release in July 2020.  ECF 95.  At that time, the nation was "in the grip of a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of it.  *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").  Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 Fed. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, to thwart the spread of the virus, which is

---

[5] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[6] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.

Many people who are stricken with the virus experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).  As of January 10, 2022, COVID-19 has infected roughly 61 million Americans and caused approximately 838,000 deaths in this country.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Jan. 10, 2022).

For a brief time, this country enjoyed a reduction of COVID-19 cases.  In the fall, the trend became more favorable.  *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021,    https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html    ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region.").  But, the spread of the Delta variant reversed this trend. *See* Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html. (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").  Indeed, the Delta variant is thought to be more virulent and capable of causing more severe illness than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL    AND    PREVENTION,    https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants");  *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-

covid-19-recedes-leaving-winter-challenge-ahead-11635672600    ("The   Delta-fueled   wave

continues to take a serious toll, but the seven day average in reported deaths has dropped to about

1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show.").

And, more recently, the emergence of the Omicron variant, both around the world and in

the United States, has sparked further cause for concern.  Although much remains unclear about

Omicron, it is believed to be highly contagious.  *See Omicron Variant: What You Need to Know*,

CTRS.  FOR  DISEASE  CONTROL  &  PREVENTION,   https://www.cdc.gov/coronavirus/2019-

ncov/variants/omicron-variant.html  (last  updated  Dec.  13,  2021).    Indeed,  Omicron  has

contributed to a substantial spike in COVID-19 cases in recent weeks.  *See, e.g.*, Aya Elamroussi,

*"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021),

https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified

certain risk factors that may increase the chance of severe illness due to the coronavirus.  Those

risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious

heart  disease;  obesity;  diabetes;  liver  disease;  and  a  compromised  immune  system.    *See*

*Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR

DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

The CDC has repeatedly revised its guidance as to medical conditions that pose a greater

risk of severe illness due to COVID-19.  Most recently in December 2021, it again updated its

guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS.

FOR DISEASE CONTROL & PREVENTION (Dec. 14, 2021), https://bit.ly/38S4NfY.  According to the

CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung

diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis,

and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

To stem the spread of the virus, people have been urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread

of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[7]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-

---

[7] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems." *America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress

passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No.

116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend

the permissible length of home confinement, subject to a finding of an emergency by the Attorney

General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued

another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL

3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's]

authority to grant home confinement to any inmate . . . ."  *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director

of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry

Services Division, issued a memorandum to implement the Attorney General's directives on the

increased use of home confinement.  The memorandum provided that the BOP was prioritizing

the review of inmates for home confinement, as to inmates who have either served a certain portion

of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to

improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer,

Moderna, and Johnson & Johnson).[8]  Initially, the vaccines were made available to health care

workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has

since been approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA*

---

[8] Questions as to the efficacy of the Johnson & Johnson vaccine have been raised as to the
Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against
Omicron -study*, REUTERS (Dec. 17, 2021), https://www.reuters.com/business/healthcare-
pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-
17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*,
N.Y. TIMES (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-
vaccine-delta.html.

*Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188.

Approximately 71% of all persons twelve years of age and older are fully vaccinated. *See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Jan. 10, 2022). And, 62% of the total U.S. population is fully vaccinated. *See id.* Moreover, nearly 74 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older. *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated Dec. 20, 2021).

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of January 10, 2022, the BOP had 135,446 federal inmates and 36,000 staff. And, by that date, the BOP had administered 282,076 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed Jan. 10, 2022).

As of January 10, 2022, the BOP reported that 3,761 out of a total 135,427 federal inmates and 922 BOP staff out of some 36,000 staff members currently test positive for COVID-19; 42,275 inmates and 8,902 staff have recovered from the virus; and 275 inmates and seven staff members have died from the virus.   Moreover, the BOP has completed 128,649 COVID-19 tests.   *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Petersburg Medium, where the defendant is imprisoned, the BOP reported that as of January 10, 2022, out of a total of 1,505 inmates, one inmate and five staff have tested positive, one inmate has died of COVID-19, and 229 inmates and 22 staff have recovered at the facility. In addition, 463 staff members and 2,369 inmates at the FCI Petersburg complex have been inoculated with the vaccine.   *See* https://www.bop.gov/coronavirus/, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/pem/ (last visited Jan. 10, 2022).

## IV.  Discussion

Moore argues that his asthma and the effects of the pandemic at FCI Petersburg, as well as the nonviolent nature of his offense, his record of rehabilitation, and his interest in spending time with his children, warrant compassionate release.   ECF 156; ECF 186.   He asserts that he is "not looking for a get out of jail free card," and suggests "home confinement" or "Gaudenzia" as a "better/productive alternative" to his current incarceration.   ECF 186 at 5.[9]

The government argues that Moore's asthma does not support a finding of extraordinary and compelling circumstances, including because defendant has been vaccinated against COVID-19.   ECF 180 at 7-10.   Furthermore, the government contends that the § 3553(a) sentencing factors do not support compassionate release.   *Id*. at 10-11.

---

[9] Gaudenzia, Inc. is a nonprofit substance abuse treatment provider, including in the criminal justice context. *See Criminal Justice Services*, Gaudenzia, https://www.gaudenzia.org/criminal-justice-services/ (last visited Jan. 10, 2022).

The sole medical condition cited by Moore in the Motion, as well as his administrative requests, is his asthma.  *See* ECF 156 at 1-2; ECF 156-1 at 4, 6; ECF 180-2; ECF 186 at 2, 4.[10]  He describes his asthma as a serious, chronic condition, diagnosed during his adolescence.  ECF 156 at 1-2; ECF 156-1 at 4, 6; ECF 186 at 4.  Further, he asserts that prison medical staff have disregarded his condition and his requests for an inhaler, forcing him to "borrow an inhaler."  ECF 156 at 2; *see also* ECF 156-1 at 4, 6; ECF 186 at 4.

The CDC is clear that people with "moderate-to-severe or uncontrolled asthma are more likely to be hospitalized from COVID-19."  *People with Moderate to Severe Asthma*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last updated Apr. 7, 2021).  But, it is unclear, based on the record, if Moore's asthma qualifies as "moderate to severe."

To be sure, the PSR indicates that Moore was diagnosed with asthma as an infant, and he used albuterol at the time of sentencing.  ECF 73, ¶¶ 56, 59.  Yet, his prison medical records paint a picture of a mild asthma condition.  In an exam on April 23, 2020, Moore complained of "shortness of breath" and requested an inhaler, "mainly for when he has to exercise."  ECF 182-1 at 14.  According to the exam notes, Moore stated that he has always used an inhaler before exercise, but the notes indicated that Moore had no prior reports of shortness of breath, no medical records showing any history of asthma, and he had never been prescribed asthma medication.  *Id.*  A physical exam found Moore's lungs "to be clear bilaterally, with normal respiratory expansion [and] no wheezes."  *Id.*  His heart rate and rhythm were regular, and his "HEENT was all within

---

[10] As noted, the PSR mentions mentions allergic rhinitis and hypertension. ECF 73, ¶ 58. But, Moore does not raise such conditions in his briefing, instead focusing on his asthma. Furthermore, his prison medical records do not mention such conditions. *See* ECF 182-1.

normal limits." *Id*.[11]  "[The] clinical exam was found to be completely benign with vital signs being stable." *Id*.  The health care provider "explained to the patient that there is no clinical indication nor need for this inmate to have an inhaler." *Id*.  The notes concluded: "no indications of asthma." *Id*.

Rulings as to asthma in the context of requests for compassionate release have been mixed. Judge Grimm has said: "This Court and others have found that the standard of extraordinary and compelling reasons was met during the COVID-19 pandemic where a defendant had a risk of serious complications from COVID-19 based on asthma and other medical conditions. . . . However, judges have also said that "mild asthma alone did not a [sic] constitute extraordinary and compelling reasons for release." *United States v. Jennings*, PWG-13-046, 2020 WL 4748462, at *4 (D. Md. Aug. 17, 2020) (collecting cases).

In *United States v. Garcia*, 538 F. Supp. 3d 226 (D. Mass. 2021), for example, the district judge remarked: "Because the CDC lists moderate to severe asthma as a condition that can increase the risk of severe illness caused by COVID-19, many courts have distinguished between petitioners with mild/moderate asthma to severe asthma when deciding whether the condition constitutes a compelling and extraordinary circumstance justifying compassionate release. . . . Moderate asthma occurs 'where the individual suffers from daily symptoms, experiences nighttime awakenings more than once a week, uses an Albuterol rescue inhaler on a daily basis, and experiences some limitation of normal activities.'" *Id*. at 229 (internal citations omitted); *see also, e.g.*, *United States v. Armstrong*, RDB-19-357, 2021 WL 2806226, at *3 (D. Md. July 6, 2021) (citing CDC guidance, declining to find extraordinary and compelling reasons based on asthma

---

[11] "HEENT" is not defined in the notes but presumably refers to head, ears, eyes, nose, and throat. *See, e.g.*, *Whitecotton by Whitecotton v. Sec'y of Health and Human Services*, 81 F.3d 1099, 1101 n.5 (Fed. Cir. 1996).

adequately managed by prescriptions); *United States v. Malone*, CCB-13-307, 2021 WL 252559, at *1 (D. Md. Jan. 26, 2021) (asthma alone was not sufficient grounds for compassionate release); *United States v. Daniels*, Crim. No. 15-127, 2020 WL 4674125, at *3 (E.D. Pa. Aug. 12, 2020) (recognizing that moderate to severe asthma could constitute an extraordinary and compelling reason for compassionate release, but concluding it was not warranted based on medical records indicating asthma is under control and that defendant was instructed to use Albuterol only to prevent attack, but not daily).

For the purpose of this case, however, I am satisfied that Moore's asthma renders him eligible for compassionate release.  And, the Court does not accept the government's argument that, because Moore has been vaccinated, this precludes a finding of extraordinary and compelling circumstances.  *See* ECF 180 at 8-10.

The COVID-19 vaccines help to reduce the health risks posed by the coronavirus.  But, the fact of vaccination does not defeat every underlying health condition that might otherwise render an individual eligible for compassionate release.  *See United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021) ("It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues."); *Spriggs*, 2021 WL 1856667, at *3 (inmate having received vaccine "does not negate that his underlying health conditions make him eligible for compassionate release.").

Indeed, recent developments make clear that the pandemic may be with us indefinitely. And the media, as well as the CDC, are filled with reports of breakthrough infections of COVID-19 among vaccinated individuals.  And, albeit in rare cases, they can result in death.  *See Rates of COVID-19 Cases and Death by Vaccination Status*, Ctrs. for Disease Control,

https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last updated Nov. 20, 2021).

Breakthrough infections seem to be particularly common with the highly contagious Omicron

variant, although vaccination seems effective at preventing serious illness. *See, e.g.*, *Omicron*

*Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL,

https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 20,

2021).

Several judges of this Court have concluded that an inmate is eligible for compassionate

release, notwithstanding vaccinated status. *See, e.g.*, *United States v. Jenkins*, DKC-12-0043, 2021

WL 5140198, at **4-5 (D. Md. Nov. 4, 2021) (granting compassionate release to a defendant based

on his obesity and chronic kidney disease, in spite of the fact that he was fully vaccinated against

COVID-19); *United States v. Garcia*, CCB-11-569, 2021 WL 4846937, at *2 (D. Md. Oct. 15,

2021) (finding that a vaccinated defendant's diabetes and hypertension constituted extraordinary

and compelling circumstances); *United States v. Hussain*, PWG-13-661, 2021 WL 3367822, at *4

(D. Md. Aug. 3, 2021) (explaining that a fully vaccinated defendant with a history of smoking as

well as a number of underlying conditions, including moderate asthma and hypertension, presented

an extraordinary and compelling reason for his release).

Under § 3582(c)(1)(A), the court must still consider the factors set forth in 18 U.S.C. §

3553(a) in deciding whether to exercise its discretion in favor of release. *See, e.g.*, *High*, 997 F.3d

at 186. These factors include: (1) the nature of the offense and the defendant's characteristics; (2)

the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and

provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range;

(4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence

disparities; and (6) the need to provide restitution to victims. *Id.* at 186.

In its Opposition, the government asserts that the defendant's sentence, and the terms of the C Plea, were well below the defendant's career offender Guideline range of 188 to 235 months of imprisonment. ECF 180 at 2, 10. But, the government did not note or address the fact that, if defendant were sentenced today, he would not qualify as a career offender.

At the time of defendant's offense, conspiracy to distribute a controlled substance under 21 U.S.C. § 846 was considered a career offender predicate offense under U.S.S.G. § 4B1.2(b). But, in *United States v. Norman*, 935 F.3d 232, 238-39 (4th Cir. 2019), the Fourth Circuit determined that federal drug conspiracy under 18 U.S.C. § 846 is categorically not a qualifying offense for career offender purposes. And, although *Norman* is not retroactive, I am not required to ignore it here. To the contrary, the court may consider the current sentencing landscape, as discussed, *infra*.

The Supreme Court has explained that the Guidelines are "the starting point and the initial benchmark" at every sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007); *see Freeman v. United States*, 564 U.S. 522, 529 (2011) ("The Guidelines provide a framework or starting point ... for the judge's exercise of discretion."); *see United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010). Thus, the Court has instructed that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall*, 552 U.S. at 49.

As indicated, I accepted the C Plea, which fell well below the career offender Guidelines. But, in sentencing Moore, I thought that the Guidelines called for a term of incarceration ranging from 188 to 235 months. And, I also considered the government's recommendation of 96 months of incarceration, which undoubtedly took the erroneous Guidelines into account.

Viewed from the current perspective, Moore's sentence of 84 months is more than a year above the high end of the actual Guidelines. With an offense level of 21 and a criminal history

category of IV, defendant's Guidelines call for a sentence ranging from 60 to 71 months of imprisonment.  *See* ECF 73, ¶ 80.

As part of the § 3553(a) analysis, many judges in this District have considered a change in the sentencing law landscape that a defendant would face if prosecuted today for the same offense. As Judge Bennett has explained: "[C]hanges in the sentencing law landscape are relevant to the Court's analysis of whether the Court's sentence appropriately addresses 'the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public." *United States v. Johnson*, No. RDB-07-0153, ECF No. 183 at 10-11 (D. Md. Oct. 14, 2020).  *See also, e.g., McCoy*, 981 F.3d at 285-86; *United States v. Stockton*, ELH-99-352, 2021 WL 1060347, at *14 (D. Md. Mar. 17, 2021); *United States v. Chandler*, GLR-05-0181, ECF 119 at 1-2 (D. Md. May 14, 2020); *United States v. Laurey*, JKB-06-0586, ECF 81 at 1, 3 (D. Md. Feb. 19, 2020); *United States v. Wesley*, JKB-10-0118, ECF 73 at 1 (D. Md. Feb. 18, 2020); *United States v. Smith*, DKC-98-0252, ECF 92 at 4 (D. Md. Feb. 14, 2020); *United States v. Watts*, PJM-06-036, ECF 114 at 7 (D. Md. Feb. 6, 2020); *United States v. Thompson*, CCB-09-0128, ECF 123 at 2 (D. Md. Jan. 16, 2020).

Moore's offense was a serious one, involving a dangerous drug—crack cocaine.  ECF 180 at 10.  Moore also has a significant criminal history, including a conviction in 2004 that involved the armed robbery of a store and a high-speed attempt to flee from the police.  But, he was just 17 years old at the time.  ECF 73, ¶ 30.  And, this is not his first federal offense.  In 2009, Moore had another federal drug conviction, which involved conspiracy to distribute heroin while already in prison.  *Id*. ¶ 31.  Clearly, the prior periods of incarceration did not deter Moore from further criminal conduct.

On the positive side, Moore has completed rehabilitative coursework while incarcerated. *See* ECF 156-1 at 8-10.  And, there is no indication of any disciplinary infractions.

Courts place significant weight on a defendant's post-sentencing conduct because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)).  That said, as noted, rehabilitation alone cannot serve as a basis for compassionate release.  *Davis*, 2022 WL 127900, at *1.  But, rehabilitation efforts can be considered.  *Id.*; *see United States v. Lancaster*, 997 F.3d 171, 175 (4th Cir. 2021) ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *United States v. McDonald*, 986 F.3d 402, 410-12 (4th Cir. 2021) (noting that on a motion to reduce sentence under the First Step Act, district court must consider defendant's post-sentencing conduct); *United States v. Randall*, 837 Fed. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct).

In addition, Moore's incarceration in the midst of a global pandemic has "sufficiently increased the severity of the sentence beyond what was originally anticipated such that the purposes of sentencing are fully met even with the proposed reduction." *United States v. Green*, TDC-10-761, 2020 WL 2992855, at *4 (D. Md. June 4, 2020); *see also United States v. Park*, No. 16-cr-00473, 2020 WL 1970603, at *5 (S.D.N.Y. Apr. 24, 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary").

In my view, although Moore does not warrant immediate release, his asthma and the other effects of the COVID-19 pandemic; the change in the law based on *Norman*, 935 F.3d 232; and defendant's conduct in the BOP create a basis for some reduction in his sentence, consistent with the Guidelines.

The First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'" *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020). Thus, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact. The statutory text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in both this Circuit and others have granted sentence reductions without immediate release. *See, e.g.*, *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733, at *5 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37-38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05-00029, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); *see also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . .").

Accordingly, I find that a reduction in Moore's sentence, from 84 to 71 months, is

warranted.  As I see it, a sentence of 71 months' imprisonment is "sufficient, but not greater than necessary" to comply with the purposes of incarceration.  18 U.S.C. § 3553(a).  This sentence also corresponds to the top end of the Guidelines, as they would apply to Moore, who is not a career offender.

## V. Conclusion

For the reasons set forth above, I shall grant the Motion in part.  I shall reduce Moore's sentence to 71 months, with credit from August 3, 2018.

An Order follows, consistent with this Memorandum Opinion.

Date: January 14, 2022

/s/
_____
Ellen L. Hollander
United States District Judge